**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CAROL MONCAK, | CASE NO. 1:14-cv-1378- GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 10, 11, 13, 14, 15 |

## <u>MEMORANDUM</u>

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Carol Moncak for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff began experiencing neck, shoulder, back and leg pain after a car accident in 2007. Imaging studies indicated significant disc herniation in her spine. Plaintiff attempted to return to work, and treated with physical therapy, chiropractic treatment, and injections, but her back pain persisted and she had to take significant family and medical leave from her job. She stopped working February of 2010, and had spinal surgery in April of 2010. She was in a back brace for six months. Initially, while in a more restrictive back brace, she

reported virtually no pain. However, once she transitioned to a less restrictive back brace, and then out of the back brace entirely, she reported that her pain returned. In February of 2011, her surgeon indicated that they might consider a return to modified work in the future, but did not release her to work at that time. However, the ALJ concluded that there was no twelve month period of time when Plaintiff's spinal complaints caused her to be unable to work.

Plaintiff's primary care physician submitted an opinion that Plaintiff had work-related functional impairments that would preclude employment under the Act. The ALJ did not obtain any medical opinion that contradicted this opinion. Instead, the ALJ, who has no medical training, undertook a lay analysis of the medical evidence, and rejected the medical opinion. This is an impermissible substitution of lay inference for the opinion of a competent professional. Moreover, the ALJ never mentions Plaintiff's surgeon's restriction from even modified duty work. Only rarely can an ALJ craft an RFC without a supporting medical opinion, and this is not one of those rare cases. Plaintiff had a spinal injury, for which she quit smoking and underwent surgery, and wore a back brace for six months thereafter. Her surgeon and primary care physician frequently documented her complaints and objective findings, and neither released her to work. As a result, the Court orders that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.     Procedural Background

On May 4, 2011, Plaintiff filed an application for DIB and SSI under Title II of the Act. (Tr. 122-25). On June 6, 2011, the Bureau of Disability Determination denied these applications (Tr. 91-96), and Plaintiff filed a request for a hearing on August 9, 2011.  (Tr. 99-100). On February 1, 2013, an ALJ held a hearing at which Plaintiff—who was not represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 38-65).  On March 1, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 22-37). On March 25, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 18-20), which the Appeals Council denied on May 16, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On July 18, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On October 6, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On November 19, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 13). On December 9, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 14). On December 18, 2014, Plaintiff filed a brief in reply. (Doc. 15). On July 20, 2015, the parties consent to the adjudication of this case by the undersigned Magistrate Judge.

## III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist

in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on June 7, 1961 and was classified by the regulations as a person closely approaching advanced age on the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 33). Plaintiff has at least a high school education and past relevant work as a press operator, customer service representative, and cashier. (Tr. 32).

Plaintiff began complaining of pain in her low back that radiated to her buttock, thigh, leg and foot and pain in her lower neck and shoulder after she was injured in a motor vehicle accident on November 3, 2007. (Tr. 194). Plaintiff was off work for seven months following her accident. (Tr. 227). On February 21, 2008, an MRI indicated spondylolisthesis with disc protrusion and "old compression deformities." (Tr. 194). Physical therapy was "slightly helpful" and chiropractic treatment was "slightly helpful but mostly short term." (Tr. 194). On February 13, 2009, she presented to Northeastern Rehabilitation Associates on referral from Dr. Thomas Majernik, D.O., her primary care physician, with continued complaints of moderate to severe pain "with low back activities such as

prolonged sitting." (Tr. 194).   She also reported "significant sleep disturbance because of the pain on a regular basis" and required Vicodin and Skelaxin once or twice a day. (Tr. 194). She denied lower extremity weakness and numbness and denied gait disturbance. (Tr. 194). She reported worsening neck and shoulder pain with "right upper extremity activities" with numbness and weakness in her left hand "with occasional dropping of objects." (Tr. 195). Plaintiff was treated with injections in February and March of 2009. (Tr. 200-207).

On November 6, 2009, Plaintiff presented to Dr. Alan P. Gillick, M.D., an orthopedist, on referral from Dr. Majernik. (Tr. 227). Plaintiff reported continued back pain with no improvement after seven months of physical therapy and two injections. (Tr. 227). Plaintiff reported that she was "miserable all the time." (Tr. 227). On physical examination, Plaintiff had pain on extension and positive straight leg raises, but was otherwise normal. (Tr. 227). Dr. Gillick noted that Plaintiff's X-rays showed "endstage narrowing of the L5-S1 disk space" and MRI "show[ed] advanced disk degeneration of L5-S1 with a central protrusion." (Tr. 227). He recommended a discogram and indicated that she "would probably be a candidate for an L5-S1 fusion." (Tr. 227).

On December 1, 2009, Plaintiff underwent a lumbar provocation discography ("discogram") for diagnoses of lumbar radiculitis, disc herniation, and degenerative disc disease. (Tr. 207). The discogram indicated concordant pain

reproduced at L5-S1. (Tr. 226). On December 21, 2009, Plaintiff followed-up with Dr. Gillick. He noted that Plaintiff "continues to experience fairly severe, fairly limiting back pain symptoms. She works 12 hour shifts as a printer at Cim-Ram and stands on concrete the entire time. The back pain has been relentless. She has to take family medical leave fairly frequently in order to deal essentially with the pain." (Tr. 226). Dr. Gillick recommended surgery and indicated that Plaintiff needed to stop smoking cigarettes first. (Tr. 226). On February 1, 2010, Plaintiff stopped working at her job as a printer, where she had worked for nine years. (Tr. 139).

On April 7, 2010, Plaintiff reported that she had successfully stopped smoking. (Tr. 225). She was "understandably nervous about proceeding [with surgery] but is confident that she would like to go ahead." (Tr. 225). On April 20, 2010, Dr. Gillick performed anterior posterior lumbar fusion surgery at L5-S1 (Tr. 217, 224). On June 9, 2010, Plaintiff followed-up with Dr. Gillick, and reported that she was "symptomatically doing relatively well." (Tr. 224). Plaintiff's physical examination was normal. (Tr. 224).

On June 25, 2010, Plaintiff followed up with Dr. Majernik. (Tr. 301). He noted that Plaintiff was wearing a back brace, and would have "to wear it for three months then goes to less restricted one for another three months....feels well otherwise." (Tr. 301). She also had disability papers. (Tr. 301). Plaintiff walked

with a normal gait for her age, denied neurological symptoms, and had an otherwise normal physical examination. (Tr. 301).

On July 29, 2010, Dr. Gillick noted  that Plaintiff was "doing extremely well" with "no complaints at all, no pain complaints." (Tr. 223). Plaintiff's physical examination was normal, she was not taking medication, and x-rays indicated a well-positioned interbody cage and plate (Tr. 223). Dr. Gillick indicated that Plaintiff would transition to a "chair back style brace. In one month she may sleep without the brace." (Tr. 223). He instructed her to follow-up in two months. (Tr. 223).

On September 22, 2010, Plaintiff followed-up with Dr. Gillick. (Tr. 222). reported that Plaintiff was "doing well," but reported "somewhat of an achy discomfort in her back, especially if she tries to walk for any period of time." (Tr. 222). Plaintiff indicated that she "still uses the Vicodin because she said if she doesn't take Vicodin at a certain time, her pain will start to escalate," and Dr. Gillick "cautioned her about some withdrawal issues with the Vicodin based on that description." (Tr. 222). He indicated that Plaintiff could begin to "wean herself out of the brace, maintain a cautiously increasing activity level." (Tr. 222).

On December 1, 2010, Plaintiff followed-up with Dr. Gillick. (Tr. 221). He noted that she was doing "relatively well" but reported "a fair amount of discomfort in her back" with "some days [when] she feels that she is still pretty

limited." (Tr. 221). Dr. Gillick also noted that Plaintiff was "still taking the pain medication which [he] explained may be an issue and she should try to begin to wean herself off the medication." (Tr. 221). He observed discomfort on extension and flexion, and recommended that Plaintiff begin physical therapy. (Tr. 221).

On February 7, 2011, Plaintiff reported to Dr. Gillick that she was "a bit improved even a little more from the last visit." (Tr. 220). Dr. Gillick observed minimal tenderness and discomfort. (Tr. 220). Plaintiff indicated that she would finish a physical therapy and home exercise program, and Dr. Gillick noted "I will see her back again for a follow-up appointment in 2-3 months, hoping at that point she can consider some type of modified return to work." (Tr. 220).

On February 15, 2011, Plaintiff presented to Dr. Majernik because she needed a slip for blood work. (Tr. 305). Plaintiff denied neurologic and musculoskeletal symptoms. (Tr. 305). Under surgical history, Dr. Majernik wrote "none." (Tr. 306). Plaintiff was noted to walk with a normal gait for her age and her physical examination was normal. (Tr. 307).

On April 18, 2011, Plaintiff followed-up with Dr. Gillick. (Tr. 219). Plaintiff was "symptomatically doing reasonably well." (Tr. 219). However, she "still has some aching discomfort in her back and a fairly constant aching in her legs. The aching in her back is actually worse when she walks, but if she walks with a cart, such as a grocery cart, she has no pain at all." (Tr. 219). Dr. Gillick observed

tenderness and discomfort. (Tr. 219). Dr. Gillick did not mention a return to work, and instead indicated only that they would "continue to cautiously increase her activity level." (Tr. 219).  He indicated that Plaintiff would follow-up with him in six months. (Tr. 219).

On May 18, 2011, Plaintiff submitted a Function Report. (Tr. 156). She indicated that she was taking Ativan and Vicodin, which cause fatigue, yawning, drowsiness, dizziness, and impaired concentration. (Tr. 156). She wrote that it was "difficult to explain [her] activity level because it varies from day to day and hour to hour depending on how pain is at the time. Legs ache continuously regardless of activity or rest." (Tr. 156). She reported that she was "terrible right now" at handling stress and did not handle changes in routine well. (Tr. 155). She reported unusual anxiety while in a car. (Tr. 155). She indicated that she spends her day watching television, playing on her computer, and playing with her cats. (Tr. 153). She indicated that she could no longer garden because she could not stoop or bend, could not read because she could not focus or concentrate, and could not shop for household goods "like [she] used to." (Tr. 153). She indicated that she hardly drives due to leg pain and shops one to two times per week with her daughter or fiancé. (Tr. 152). She reported that she does some light housework, but no yard work. (Tr. 151). She indicated that she prepared meals, but could "no longer cook big homemade meals" and instead spends ten to fifteen minutes making

sandwiches, fruits, and frozen microwave dinners. (Tr. 151). She indicate that back and leg pain interfere with her sleep. (Tr. 150).

On July 7, 2011, Plaintiff presented to Dr. Majernik complaining of constant leg pain. (Tr. 350-51). She reported that her pain disturbed her sleep. T(r. 350). Plaintiff walked with a "labored" gait and had limited range of motion. (Tr. 351). Dr. Majernik ordered an MRI and an arterial duplex scan of her lower extremities (Tr. 352).The MRI indicated levoscoliosis, shallow spondylosis and bulging, and stable chronic superior endplate deformities at L1 and L2. (Tr. 353).

On August 8, 2011, Plaintiff followed-up with Dr. Majernik. (Tr. 346). The nurses' note indicates that Plaintiff was there for leg and back pain. (Tr. 346). Plaintiff walked with a normal gait and her physical examination was normal. (Tr. 347).

On October 19, 2011, Plaintiff followed-up with Dr. Gillick. (Tr. 356). He noted that, "[s]ymptomatically she is experiencing discomfort." (Tr. 356). Plaintiff had discomfort on examination, and Dr. Gillick noted that the "etiology of the pain is unclear." (Tr. 356).

On November 4, 2011, Plaintiff followed-up with Dr. Majernik. (Tr. 342). She reported low back pain. (Tr. 342). Plaintiff walked with a slightly antalgic gait and had paravertebral tenderness. (Tr. 343). Her neurological examination was normal. (Tr. 343). On February 14, 2012, Plaintiff reported back pain and pain that

radiated to her knees bilaterally. (Tr. 339). Again, she walked with a slightly antalgic gait and had paravertebral tenderness. (Tr. 340).

On May 14, 2012, Dr. Majernik authored an opinion on Plaintiff's work-related function. (Tr. 361). He opined that Plaintiff's experience of pain would "constantly" interfere with "attention and concentration needed to perform even simple work tasks." (Tr. 358). He opined that Plaintiff could walk ¼ of a city block before needing to rest and could only sit or stand for fifteen minutes at a time. (Tr. 358). He opined that she could sit, stand, and walk for less than two hours each out of an eight-hour work day. (Tr. 359). He opined that Plaintiff would need unscheduled breaks every fifteen minutes that lasted five minutes during which she would need to lie down. (Tr. 359). He opined that she could occasionally lift less than ten pounds and never lift ten pounds or more. (Tr. 360). He opined that she could occasionally climb stairs and never twist, stoop, bend, crouch, squat or climb ladders. (Tr. 360). He opined that Plaintiff's impairments were likely to produce "good days" and "bad days" and that she would be absent four or more days per month. (Tr. 360). Dr. Majernik based his opinion on Plaintiff's "constant pain" and inability to concentrate. (Tr. 361). He cited her Vicodin use, which causes drowsiness, along with positive straight leg raise, abnormal gait, paralumbar tenderness and muscle spasm, and impaired sleep. (Tr. 358).

On May 15, 2012, Plaintiff followed-up with Dr. Majernik for hypertension, hyperlipidemia, and diabetes. (Tr. 368). She did not mention musculoskeletal or neurologic complaints. (Tr. 368).

On June 25, 2012, Plaintiff followed-up with Dr. Gillick. (Tr. 374). Plaintiff was "symptomatically about the same," with improvement from "where she was preoperatively" but "still has enough pain that it is a nuisance." (Tr. 374). Plaintiff indicated that she was "constantly looking for ways to treat the pain" and "tries to stay away from any type of narcotic medication." (Tr. 374). On examination, she had tenderness and discomfort. (Tr. 374). Her X-rays showed intact instrumentation and a "nicely healed fusion," so Dr. Gillick noted that the "etiology of the pain is unclear." (Tr. 374). He indicated that "some of the symptoms are suggestive that it could be at least partially hardware related pain. We did talk about considering removing her posterior instrumentation. She is not enthusiastic about additional surgery. She will consider the option." (Tr. 374). He instructed her to follow-up with him in six months. (Tr. 374).

On August 31, 2012, Plaintiff followed-up with Dr. Majernik for a follow-up antibiotic for congestion and couch. (Tr. 365). Plaintiff did not mention musculoskeletal problems and walked with a normal gait for her age. (Tr. 367).

On February 1, 2013, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 40). She testified that she was unable to work due to constant back and

leg pain along with diabetic neuropathy in her feet. (Tr. 48). She testified that she

consistently reported pain to Dr. Gillick, but every time she followed-up with him,

he stated "give it six more months." (Tr. 49). She explained that "he said well

sometimes it takes up to 18 months to get back to where you were." (Tr. 49). She

explained that she had surgery because she was "in and out of work so many times

with FMLA and you know, they don't like that but I would have to call out

consistently." (Tr. 49). She elaborated that Dr. Gillick "now recommended maybe I

should have another surgery to go in there and take the cage they put in there out of

my back. But having no insurance and no income, that was his last

recommendation." (Tr. 49). She also testified that she has "terrible anxiety" and

that her pain makes her irritable. (Tr. 50). She described her day, explaining:

> Most of the day is spent either laying on the couch. My couch turns
> into a recliner so I do a lot of that. Elevate my legs to get some of the
> pressure off my back. And also my ankles swell so by elevating my
> legs, it helps with the ankles plus it takes that pressure off my back for
> a while. So I do that, I watch TV. I do a couple little things around the
> house.

(Tr. 50). She indicated that she spent ten hours a day watching television, and a

"few minutes" at a time on the computer. (Tr. 51). She testified that she could no

longer garden and that her fiancé always accompanies her shopping, "which he

hates." (Tr. 52). She indicated that her fiancé does the laundry. (Tr. 52). When

asked if she cooks, she explained that "if that's what you want to call cooking. I no

longer cook like I used to. Even this Christmas, we had Chinese food." (Tr. 52).

She testified that she could sit for a half an hour, stand for twenty minutes, walk about a block at a time, and lift about five pounds. (Tr. 53). She testified that her medications make it difficult to concentrate so she could no longer read. (Tr. 55). She testified that she never sleeps through the night, and has up to four naps per day that last from an hour to an hour and a half each. (Tr. 56).

On March 1, 2013, the ALJ issued the decision. (Tr. 34). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2010, the alleged onset date. (Tr.27). At step two, the ALJ found that Plaintiff's degenerative disc disease of the lumbar spine, status post lumbar fusion, and diabetes were medically determinable. (Tr. 27). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 29).

The ALJ rejected Plaintiff's credibility because "within months [of her surgery] the claimant was cleared to sleep without a brace and within a year the claimant was doing well and could increase activity level with another appointment not for another six months (Exhibit 3F through 5F)." (Tr. 30). The ALJ also relied on Dr. Gillick's note that she had improved "to the point that she was better than she was pre-operatively," because she indicated that she wanted to avoid narcotic pain medications, Dr. Gillick's examinations that indicated normal motor strength and sensation, and Dr. Majernik's observation in August of 2012 that she walked with a normal gait. (Tr. 31). Finally, the ALJ concluded that Plaintiff was not

credible because she was able to dress herself, "completes meals, and engages in household chores." (Tr. 32). The ALJ rejected Dr. Majernik's opinion because Plaintiff "prepares meals longer than the limits suggested by Dr. Majernik," she "shops for up to two hours up to two times per week," she "talks on her phone and uses her computer suggesting that shitting [sic] and standing intermittently defers extensively to her subjective allegations," and "Dr. Majernik's notes reflect the claimant is doing well despite the difficulties with pain." (Tr. 32). The ALJ did not rely on any state agency opinion to reject Dr. Majernik's opinion. (Tr. 32).

Consequently, the ALJ found that Plaintiff had the RFC to perform:

> [L]ight work as defined in 20 C.FR 404.1567(b). While the claimant is capable of lifting and carrying up to twenty pounds occasionally and ten pounds frequently with sitting, standing or walking capability of six hours in an eight-hour workday and may frequently climb ramps and stairs, the claimant is limited to occupations that permit the ability to sit or stand every thirty minutes. The claimant must avoid concentrated exposure to unprotected heights and may never climb ladders, ropes, or scaffolds. The claimant must avoid concentrated exposure to extreme cold temperatures, wetness, and environmental irritants (such as dust, fumes, odors and gases). Lastly, the claimant is limited to occupations that require no more than occasional use of bilateral lower extremities for the operation of foot controls and pedals.

(Tr. 29). At step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 32). At step five, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 33). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 34).

## VI.    Plaintiff Allegations of Error

## A.    Evaluation of the medical opinions

Plaintiff asserts that the ALJ erred in evaluating the medical opinions. The ALJ rejected the  only medical opinions in the record, and failed to request a records review or consultative examination. Consequently, he crafted an RFC without the basis of a medical opinion. The ALJ also rejected the treating opinion for the "wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993). These opinions contradict the ALJ's RFC assessment, so the ALJ's failure to properly evaluate them renders the RFC assessment defective.

An ALJ must weigh medical opinions in making an RFC assessment. The social security regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R. § 416.927(d)(2).  Section 404.1527(c) establishes the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under subsections (c)(1) and (c)(2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians, as discussed above. Section 404.1527(c)(2) also differentiates among treating relationships

based on the length of the treating relationship and the nature and extent of the treating relationship. Subsection 404.1527(c)(3) provides more weight to opinions that are well supported, which means that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." Subsection 404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Subsection 404.1527(c)(5) provides more weight to specialists, and subsection 404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

In *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), the Third Circuit set forth the standard for evaluating the opinion of a treating physician, stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer [v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. The ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See *Adorno*, 40 F.3d

at 48.   In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.   *Plummer*, 186 F.3d at 429; *Frankenfield v.   Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318.

Generally, an ALJ may not reject all of the medical opinions in the record and assess an RFC that is greater than found by the medical professionals. As Courts in this District have repeatedly emphasized:

The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. *See Burnett v. Commissioner of Social Sec. Admin.,* 220 F.3d 112, 121– 122 (3d Cir.2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

*Gormont v. Astrue*, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013) (Nealon, J.); *see also Bloomer v. Colvin*, 3:13-CV-00862, 2014 WL 4105272, at *5 (M.D. Pa. Aug. 19, 2014) (Jones, J.); *House v. Colvin*, 3:12-CV-02358, 2014 WL 3866072, at *8 (M.D. Pa. Aug. 6, 2014) (Kane, J.); *Muhaw v. Colvin*, CIV.A. 3:12-2214, 2014 WL 3743345, at *15 (M.D. Pa. July 30, 2014)

(Mannion, J.). *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014) (Mariani, J.); *Arnold v. Colvin*, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014) (Brann, J.); *Kaumans v. Astrue*, 3:11-CV-01404, 2012 WL 5864436, at *12 (M.D. Pa. Nov. 19, 2012) (Caputo, J.); *Troshak v. Astrue*, 4:11-CV-00872, 2012 WL 4472024, at *7-8 (M.D. Pa. Sept. 26, 2012) (Munley, J.); *Shedden v. Astrue*, 4:10-CV-2515, 2012 WL 760632, at *11 (M.D. Pa. Mar. 7, 2012) (Rambo, J.); *Duvall-Duncan v. Colvin*, 1:14-CV-17, 2015 WL 1201397, at *11 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *McKean v. Colvin*, 1:13-CV-2585, 2015 WL 1201388, at *8 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *Hawk v. Colvin*, 1:14-CV-337, 2015 WL 1198087, at *12 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.).

As Judge Mariani explains in *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014):

> The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion.
> …
> The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon. For example, three physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other

medical opinions upon which the ALJ could base her decision that
Maellaro essentially had no limitations in his ability to stand or walk.
Tr. 283. Consequently, the ALJ's decision to reject the opinions of
Drs. Singh and Dawson, and the ALJ's determination of Maellaro's
residual functional capacity, cannot be said to be supported by
substantial evidence.

*Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18,

2014); *see also* Bloomer v. Colvin, 3:13-CV-00862, 2014 WL 4105272, at *6

(M.D. Pa. Aug. 19, 2014) (Jones, J.); ("The ALJ did not cite to a single medical

opinion that contradicted [the treating source] opinion; thus, the ALJ improperly

set his "own expertise against that of a physician who present[ed] competent

medical evidence.' Consequently, the AJL's residual functional capacity

determination is not supported by substantial evidence.") (quoting *Plummer v.*

*Apfel*, 186 F.3d 422, 429 (2d Cir.1999)).

   This is not one of those rare cases when an ALJ may reject all of the medical

opinions in the record and craft an RFC without the benefit of a supporting medical

opinion. Not only did the ALJ fail to craft an RFC with a supporting medical

opinion, he rejected Dr. Majernik's opinion for the "wrong reasons." *Mason v.*

*Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ improperly concluded that

the medical evidence failed to support Dr. Majernik's opinion because he

selectively cited medical records that supported his opinion, without

acknowledging contradictory notes. The ALJ also improperly relied on Dr.

Majernik's treatment notes and other records that Plaintiff was doing well, without

recognizing the difference between a clinical setting and a workplace. Finally, the ALJ improperly relied on activities of daily living that can be characterized as sporadic and transitory at best.

The ALJ never discusses Dr. Gillick's restriction from even modified duty work. The ALJ wrote "within a year the claimant was doing well and could increase activity level with another appointment for another six months." (Tr. 30). This is a cite to Dr. Gillick's indication in September of 2010 and April of 2011 that Plaintiff could "maintain a cautiously increasing activity level." (Tr. 222). However, the ALJ errs in concluding that Plaintiff was only seeing Dr. Gillick only every six months within a year, as she saw him on July 29, 2010, September 22, 2010, December 1, 2010, February 7, 2011, and April 18, 2011.  (Tr. 219-223). Moreover, the ALJ never mentions Dr. Gillick's indication that Plaintiff's "cautiously increasing activity level" did not include even a modified return to work. On February 7, 2011, he wrote "I will see her back again for a follow-up appointment in 2-3 months, hoping at that point she can consider some type of modified return to work." (Tr. 220).

The ALJ likely should have evaluated Dr. Gillick's February 7, 2011 notation as a treating source opinion. Under the Regulations, 20 C.F.R. 404.1527(c) states that the ALJ "will evaluate every medical opinion we receive." *Id.* The Regulations further explain that "[m]edical opinions are statements from

physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." *Id.* There is a heightened requirement in Section 1527(c)(2), which applies only to treating physicians. Section 1527(c)(2) states that ALJs "will *always give good reasons* in [the] *notice of determination or decision* for the weight we give your treating physician's opinion." *Id.* (emphasis added). *See also Ray v. Colvin*, 1:13-CV-0073, 2014 WL 1371585, at *21 (M.D. Pa. Apr. 8, 2014) ("The cursory manner in which the ALJ rejected Dr. Jacob's opinions runs afoul of the regulation's requirement to " give good reasons" for not crediting the opinion of a treating source upon consideration of the factors listed above. While there may be sufficient evidence in the record to support the ALJ's ultimate decision that Plaintiff was not under a disability, and, thus, the same outcome may result from remand, the court cannot excuse the denial of a mandatory procedural protection on this basis."). The ALJ's failure to discuss this opinion from a treating physician is reversible error under the Regulations.

Moreover, the ALJ's failure to discuss Dr. Gillick's restriction from even modified duty work violates Third Circuit precedent. As the Third Circuit has explained:

> This Court has long been concerned with ALJ opinions that fail properly to consider, discuss and weigh relevant medical evidence.

> *See Dobrowolsky v. Califano,* 606 F.2d 403, 406–07 (3d Cir.1979) ("This Court has repeatedly emphasized that the special nature of proceedings for disability benefits dictates care on the part of the agency in developing an administrative record and in explicitly weighing all evidence."). Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided. *See Cotter,* 642 F.2d at 706 (listing cases remanded for ALJ's failure to provide explanation of reason for rejecting or not addressing relevant probative evidence).

*Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).    Similarly, an ALJ may not reject an opinion by a treating physician based on a factual mischaracterization of the record. *Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981) ("Since the ALJ…misconstrued the evidence considered, his conclusion…must be reconsidered").   Dr. Gillick's opinion constitutes "conflicting probative evidence in the record" that was dismissed without explanation.   *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).  The ALJ also never mentions Dr. Majernik's observations of Plaintiff's abnormal gait, just his observations of Plaintiff when she displayed a normal gait. Consequently, remand is appropriate because the AL failed to address relevant probative evidence. *Cotter,* 642 F.2d at 706.

The ALJ also erred in independently interpreting Dr. Majernik and Dr. Gillick's records to conclude that they were inconsistent with Dr. Majernik's opinion. An ALJ may not reject a treating physician opinion based on inferences from medical records. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("[A]n

ALJ may not make speculative inferences from medical reports") (citing *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981)). Moreover:

> Dr. Erro's observations that Morales is "stable and well controlled with medication" during treatment does not support the medical conclusion that Morales can return to work. Dr. Erro, despite his notation, opined that Morales's mental impairment rendered him markedly limited in a number of relevant work-related activities. Other information in the treatment records supports this opinion. Thus, Dr. Erro's opinion that Morales's ability to function is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting.

*Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Similarly, the Third Circuit has explained:

> By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence. Again, if the ALJ believed that Dr. Scott's reports were conclusory or unclear, it was incumbent upon the ALJ to secure additional evidence from another physician.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). The ALJ's rationales that Plaintiff was "doing well" and had improved constitute "inference[s] gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Thus, the ALJ made "speculative inferences from medical reports" and "set his own expertise against that of a physician who presents competent

evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). This is also reversible error.

Finally, the ALJ improperly relied on Plaintiff's activities of daily living. Plaintiff was able to do things like make sandwiches, sleep without a back brace, and shop in stores with assistance, but as the Seventh Circuit has explained:

> For example, the judge noted that the plaintiff dresses appropriately, shops for food, prepares meals and performs other household chores, is an "active participator [*sic*] in group therapy," is "independent in her personal hygiene," and takes care of her 13-year-old son. This is just to say that the plaintiff is not a raving maniac who needs to be locked up.

*Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *see also Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001) ("Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity"); *Smith v. Califano,* 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. Smith's activities are miniscule when compared to a plethora of cases which have held that there was total disability even when the claimant was far more active than Smith. It is well established that sporadic or transitory activity does not disprove disability.").

These errors are compounded by the ALJ's failure to base his RFC on any medical opinion that supports his RFC, either with a state agency reviewing

physician or a consultative examination. Thus, the Court recommends remand for the ALJ to properly evaluate the opinion evidence and assess Plaintiff's RFC. Because the Court recommends remand on these grounds, the Court declines to address Plaintiff's other allegations of error. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## VII.   Conclusion

The Court finds that the ALJ's decision lacks substantial evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.


Dated: August 5, 2015                    _____s/Gerald B. Cohn_____
                                         GERALD B. COHN
                                         UNITED STATES MAGISTRATE JUDGE